# BROWN & CONNERY, LLP

ATTORNEYS AT LAW
360 HADDON AVENUE
WESTMONT, NEW JERSEY 08108
(856) 854-8900
FAX (856) 858-4967

Susan M. Leming, Esq.
sleming@brownconnery.com

December 24, 2020

**VIA CM/ECF ONLY**
Renée Marie Bumb, U.S.D.J.
Mitchell H. Cohen U.S. Courthouse
1 John F. Gerry Plaza, Room 2040
Camden, NJ 08102-2040

> Re:   **Colby Restaurant Group, Inc., et al. v. Utica National Insurance Group et al.**
> **Civil Action No.: 1:20-cv-05927-RMB-KMW**

Dear Judge Bumb:

Defendants respectfully submit this notice of supplemental authority in connection with Defendants' fully briefed motion to dismiss. (Dkt. No. 17). Attached hereto as Exhibit A is a list of the 5 decisions dismissing similar cases since Defendant's prior notice of supplemental authority filed on December 16, 2020. (Dkt. No. 27). Exhibits B through E are those listed decisions not otherwise available on Westlaw, copies of which are filed herewith.

On November 9, 2020, Defendants submitted the order in FAFB LLC v. Blackboard Insurance Co., No. MER-L-000892-20 (N.J. Super. Ct. Law Div. Oct. 30, 2020) (Hurd, J.) granting defendant's motion to dismiss COVID-19 coverage claims. On November 4, 2020, the court provided the reasoning for its decision on the record, a transcript of which is attached hereto as Exhibit B. The court held that "there's no coverage under New Jersey Law for loss of use . . . standing alone without some physical impact on the property[,]" and since "the Government orders to prevent COVID-19 . . . do not represent an external event that changed the insured property [and] [e]very physical element of the dining rooms, the floors, the ceilings, the plumbing, the HVAC, the tables, the chairs underwent no physical damage as a result of the order[,]" the business had not suffered direct physical loss of or damage to property. The court reinforced this reasoning by noting that the policy defined "period of restoration" as ending when the premises were "repaired, rebuilt or replaced," and acknowledged that when a government order limits the use of property, "there's really no dispute here that there is nothing to repair, rebuild or replace." The court further held that the virus exclusion barred the business' insurance claims because "there's no legitimate dispute that the COVID-19 virus is capable of inducing physical distress, illness or disease[,]" and "civil authority coverage does not apply here where the neighboring properties were also impacted by the same Government use restrictions applying to plaintiff . . . . [because] the insureds cannot establish the requisite causal nexus between damage to nearby property and the Government order."

7BQ0566

Hon. Renée Marie Bumb, U.S.D.J.
December 24, 2020
Page 2

      Additionally, in LJ New Haven LLC v. AmGUARD Insurance Co., No. 20-cv-00751 (D. Conn. Dec. 21, 2020), the U.S. District Court for the District of Connecticut dismissed a business' claims seeking coverage under Defendant AmGUARD's property insurance policy for business income allegedly lost due to COVID-19 social-distancing orders.  The court held that the policy's virus exclusion precluded plaintiff's claims because "the Order itself identifies as its very rationale COVID-19, the emergency conditions it has caused, and the consequent need to stop its spread."  The court added that "remoteness is not an issue here" as "[t]he causal links represented by the virus and the Order are interlocking—even intertwined."

      Finally, Defendants' prior notice of supplemental authority dated December 2, 2020 (Dkt. No. 24), included an incorrect Westlaw citation for the order granting defendant's motion to dismiss in Goodwill Industries of Central Oklahoma v. Philadelphia Indemnity Insurance Co., No. 20-cv-511 (W.D. Okla. Nov. 9, 2020).  A copy of the decision is attached hereto as Exhibit C.

      We thank the Court for its time and attention to this matter.

Respectfully submitted,

**BROWN & CONNERY, LLP**

*s/ Susan M. Leming*

Susan M. Leming

Enclosures
cc: All Counsel of Record (via CM/ECF)

Hon. Renée Marie Bumb, U.S.D.J.
December 24, 2020
Page 3

## Exhibit A

1. Ex. D, *1210 McGavock Street Hospitality Partners, LLC v. Admiral Indemnity Co.*, No. 3:20-cv-694 (M.D. Tenn. Dec. 23, 2020) (granting motion to dismiss because (1) an identical virus exclusion barred claims for "business losses stemming from closures implemented for the purpose of attempting to mitigate the spread of the coronavirus;" (2) "economic loss" does not constitute "direct physical loss of or damage to property;" and (3) civil authority coverage was not warranted, as "coronavirus did not cause property damage, meaning actual physical damage," the closure order was not issued because of dangerous physical conditions nearby, and the orders did not "prohibit physical access" to plaintiff's property).

2. Ex. B, *FAFB, LLC v. Blackboard Insurance Co.*, No. MER-L-892-20 (N.J. Sup. Ct. Nov. 4, 2020) (granting motion to dismiss because "[e]very physical element of [plaintiff's premises] . . . underwent no physical damage as a result of the [social-distancing] order"; the policy's virus exclusion applied because "there's no legitimate dispute that the COVID-19 virus is capable of inducing physical distress, illness, or disease"; and "while the civil authority orders here precluded plaintiff from operating its in-person dining facility, they did not prohibit access to the premises for other purposes such as takeout and delivery").

3. Ex. E, *LJ New Haven LLC v. AmGUARD Insurance Co.*, No. 20-cv-00751 (D. Conn. Dec. 21, 2020) (granting motion to dismiss because virus exclusion barred claims for loss arising from COVID-19 social distancing orders).

4. *Newchops Restaurant Comcast LLC v. Admiral Indemnity Co.*, No. 20-cv-1949, 2020 WL 7395153 (E.D. Pa. Dec. 17, 2020), *LH Dining LLC v. Admiral Indemnity Co.*, No. 20-cv-1869, 2020 WL 7395153 (E.D. Pa. Dec. 17, 2020) (granting motion to dismiss because (i) neither "[l]oss of utility," nor "the mere possibility of the presence of the virus in . . . nearby properties" qualified as structural or physical damage to trigger civil authority coverage; (ii) plaintiff's claims were precluded by the policy's governmental order exclusion, which excluded loss or damage cause by "[t]he enforcement of any ordinance or law . . . [r]egulating the construction, use, or repair of any property"; and (iii) the policy's virus exclusion was unambiguous and precluded coverage despite not specifically referring to a "pandemic" because "there is no real distinction between 'virus' and 'coronavirus pandemic'").

5. *Prime Time Sports Grill, Inc. v. Dtw 1991 Underwriting Ltd.*, No. 8:20-CV-771-T-36JSS, 2020 WL 7398646 (M.D. Fla. Dec. 17, 2020) (granting motion to dismiss because plaintiff "suffered an economic loss that did not result from tangible damage," which "is not the type of loss that Defendant undertook to pay for based on the plain meaning of the language in the policy").

# Exhibit B

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION, CIVIL PART
MERCER COUNTY, NEW JERSEY
DOCKET NO. MER-L-892-20
A.D. #_____

| | | |
|---|---|---|
| FAFB, LLC, | ) | |
| | ) | TRANSCRIPT |
| Plaintiff, | ) | |
| | ) | OF |
| v. | ) | |
| | ) | DECISION |
| BLACKBOARD INSURANCE | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

Place:  Mercer County Courthouse
        175 South Broad Street
        Trenton, NJ 08650

Date:   November 4, 2020


BEFORE:

  THE HON. DOUGLAS H. HURD, P.J.Cv.

TRANSCRIPT ORDERED BY:

  RALPH P. FERRARA, ESQ. (Ferrara Law Group, P.C.)

Transcriber, Kelli R. Philburn
**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, NJ 08619**
            **(609)586-2311**
**FAX NO.   (609)587-3599**
**E-mail:   jjcourt@jjcourt.com**
**Website:  www.jjcourt.com**

Audio Recorded
Audio Operator, Joy Baldwin

2

# I N D E X

**PAGE**

**DECISION**                                                    3

---

3

```
1              THE COURT:  Docketed Mercer County Law
2     Division 892-20.  This matter deals with a motion to
3     dismiss filed by the defendant.  There is opposition
4     from the plaintiff.  A reply was also filed.  Oral
5     argument occurred on October 30th and today is November
6     4th and the Court is putting its decision on the
7     record.
8              In this matter, the plaintiff is a restaurant
9     that operates the Salted Lime Kitchen & Bar which is a
10    restaurant and bar in Somerdale (sic), Brunswick, New
11    Jersey.  This deals with the COVID-19 pandemic and the
12    Governor's orders that resulted in the closure of
13    businesses and restaurants.  Specifically in March
14    2020, the Governor entered various executive orders
15    which prohibited restaurants from having any dining in
16    their premises and limited the dining.  Obviously, the
17    executive orders had other matters that were part of
18    it, but this focuses on that part of those orders.  And
19    plaintiff claims that as a result of those orders, it
20    cannot use its restaurant space and ultimately had to
21    close.
22             Plaintiff claims that it has suffered a
23    substantial loss of business and income and that the
24    closure was a result of the orders that are physically
25    impacting plaintiff's business.  That's in Plaintiff's
```

4

```
 1          complaint at Paragraphs 20 and 21.  Plaintiff has
 2          business owner's insurance with the defendant
 3          Blackboard for the period November 6, 2019 through
 4          November 6, 2020.  The policy includes business
 5          interruption coverage, including coverage for business
 6          income, extra expense and loss resulting from civil
 7          authority.  Here in Mercer County, plaintiff has filed
 8          a declaratory judgment action in which they seek the
 9          declaration that Blackboard has an obligation to
10          provide business interruption, extra expense and civil
11          authority coverage and that the virus exclusion policy
12          does not apply to plaintiff's loss.
13                  This is a 4:6-2(e) motion which we know
14          should be granted only in the rarest of circumstances.
15          The leading case that we know deals with 4:6-2 is
16          Printing Mart v. Sharp Electronics, 116 N.J. 739.  And
17          the Court in that case said at this preliminary stage
18          of the litigation, the Court is not concerned with the
19          ability of plaintiff to prove the allegations contained
20          in the complaint.  For purposes of analysis, plaintiffs
21          are entitled to every reasonable inference of fact and
22          the examination of the complaint's allegations of fact
23          required by those principles should be one that is at
24          once painstaking and undertaken with a generous and
25          hospitable approach.  So that is the framework by which
```

5

```
 1          the Court will consider this motion.
 2                  The plaintiff, as I said, has alleged that it
 3          suffered covered loss or damage as a result of the
 4          closure of its business based on the Governor's orders.
 5          Plaintiff points to Section I.A.4(f) of the contract
 6          that provides the following business income coverage.
 7          Quote, we will pay for the actual loss of business
 8          income you sustained due to the necessary suspension of
 9          your operations during the period of restoration.  The
10          suspension must be caused by direct physical loss of or
11          damage to property at the described premises.  The loss
12          or damage must be caused by or result from the covered
13          cause of loss, closed quote.
14                  Also, the policy defines covered with respect
15          to extra expense and the policy provides at
16          Subparagraph (g) that we will pay necessary extra
17          expense that you incur during the period of restoration
18          that you would not have incurred if there had been no
19          direct physical loss or damage to property at the
20          described premises.  The loss or damage must be caused
21          by or result from a covered cause of loss.
22                  And we know from the case of President v.
23          Jenkins, 180 N.J. 550, that when reviewing an insurance
24          policy, a Court should give the policy's words their
25          plain ordinary meaning.  And when the Court uses that
```

6

1    test and applies it to the language in the policy,
2    including that this is income or extra expense coverage
3    and the other coverage sections and exclusion sections
4    that are the subject of dispute here, it's clear that
5    the motion must be granted.
6            The Court should dismiss the complaint even
7    when the facts construed in its favor fail to
8    articulate a legal basis for relief and that's the case
9    here and that's the Rieder v. State Department of
10   Transportation case, 221 N.J. Super. 547.  And as that
11   case said, as well, and it's applicable to this case,
12   too, there is no need for discovery to resolve these
13   issues.  Even assuming discovery bears out all of
14   plaintiff's allegations, there would be no coverage.
15           So dismissal is mandated where the factual
16   allegations are palpably insufficient to support a
17   claim of relief upon which relief can be granted.
18   Specifically, even assuming that discovery could prove
19   all of plaintiff's allegations true, this would only
20   establish a loss of use of property and there's no
21   coverage under New Jersey Law for loss of use, quote,
22   unquote, standing alone without some physical impact on
23   the property and that's a quote from one of the cases
24   cited by both parties here from Wakefern at Page 540.
25           Here, the Government orders do not create any

7

1    distinct demonstrable physical impact on the property.
2    The Government orders to prevent COVID-19, quote, do
3    not represent an external event that changed the
4    insured property.  Every physical element of the dining
5    rooms, the floors, the ceilings, the plumbing, the
6    HVAC, the tables, the chairs underwent no physical
7    damage as a result of the order, closed quote.  And
8    that's a quote from the Henry's case, 2020 WL 5938755
9    in which the Court interpreted Government orders as
10   physical loss would exceed any reasonable bounds of
11   possible construction.  And that same analysis clearly
12   applies to this case.
13           In addition, there's really no dispute here
14   that there is nothing to repair, rebuild or replace
15   that in the ordinary meaning of those terms, but
16   because, as we know here, the plaintiff's policy
17   provides coverage only during a period of restoration
18   which expressly assumes repair, rebuild or replacement
19   of property.  So it's fair then and the convincing
20   argument is the one of the defendant that a reasonable
21   insured would understand a repair to become necessary
22   upon a tangible alteration of property and not in
23   context of a Government order imposing use
24   restrictions.
25           So because the plaintiff has asserted that

8

1      the loss was caused by the Governor's closure orders
2      and not the virus, it's clear that plaintiff's position
3      is contrary to New Jersey Law, as I said, that requires
4      plaintiff to establish that their structures, their
5      insured structures, were, in fact, physically damaged
6      in order to trigger coverage.  The defendant has also
7      cited to 26 additional cases that nationwide have --
8      that they claim have dismissed identical claims.  The
9      Court has gone through those cases and finds them,
10     obviously, not binding on this Court, but very
11     persuasive in its analysis.
12              In addition, the plaintiff is seeking its
13     rights to coverage under the policy's civil authority
14     provisions and that's from Paragraph 24 of the
15     complaint.  Once again, under a plain reading of the
16     policy, it's clear that this claim fails as a matter of
17     law.  The policy's civil authority coverage applies
18     only in specifically defined circumstances specifically
19     where damage to a nearby property prohibits access to
20     the immediately surrounding area, including the insured
21     restaurant.  There is no civil authority coverage
22     except under those circumstances.
23              And it's clear that civil authority coverage
24     does not apply here where the neighboring properties
25     were also impacted by the same Government use

9

1      restrictions applying to plaintiff or face the same
2      threat.  Defendant cites to many cases of other courts
3      across the country that are persuasive on this Court
4      that have dismissed claims for civil authority coverage
5      for losses from Government restrictions due to COVID-19
6      because the insureds cannot establish the requisite
7      causal nexus between damage to nearby property and the
8      Government order.
9              In addition, the civil authority orders are
10     only covered to the extent access to plaintiff's
11     physical premises is prohibited and not if plaintiffs
12     are simply prohibited from operating their business.
13     So while the civil authority orders here precluded
14     plaintiff from operating its in-person dining facility,
15     they did not prohibit access to the premises for other
16     purposes such as takeout and delivery.
17              The Court has gone through the plaintiff's
18     cases cited in support of its position and with respect
19     those cases are not persuasive on this Court.  Those
20     cases involve typically they involve the prohibition on
21     access to the insured property because of damage to
22     neighboring properties which is not the case here.
23              Turning now to the virus exclusion.  The
24     policy provides at Section B that we will not pay for
25     loss or damage caused directly or indirectly by any of

1    the following, such loss or damages excluded,
2    regardless of any other cause or event that contributes
3    concurrently or in any sequence to the loss.  These
4    exclusions apply whether or not the loss event results
5    in widespread damage or affects a substantial area --
6             UNIDENTIFIED SPEAKER:  Three more minutes.
7             THE COURT:  -- at Subsection J.  We have the
8    virus or bacteria exclusion.  Any virus, bacterium or
9    other microorganism that induces or is capable of
10   inducing physical distress, illness or disease.  Once
11   again, a plain reading of that language makes it clear
12   that the plaintiff's claim must fail as a matter of
13   law.  And that's, you know, under the assumption that
14   plaintiff has pled facts sufficient to establish a
15   direct physical loss or damage which, as I already
16   said, they haven't.  But, nonetheless, its claims would
17   still be precluded under the policy's exclusion for
18   loss or damage caused directly or indirectly, which is
19   a very important word there, by any virus, bacterium or
20   other microorganism that induces or is capable of
21   inducing physical distress, illness or disease.
22             There really is no differing or other
23   interpretation of the policy that would support the
24   plaintiff's position because there's no legitimate
25   dispute that the COVID-19 virus is capable of inducing

1    physical distress, illness or disease.  And, once
2    again, the cases cited by the defendants here are
3    certainly persuasive on this Court and consistent with
4    the policy language that this Court is dealing with and
5    requires that the claim be dismissed due to the virus
6    exclusion.
7             Plaintiff next makes an argument in its brief
8    with respect to regulatory estoppel.  However, the
9    regulatory estoppel theory is not pled in its brief and
10   is not -- should not be considered by the Court.  But,
11   nonetheless, even if the Court were to consider that
12   position since it is raised in its opposing brief, it's
13   clear that this regulatory estoppel theory does not
14   defeat the motion to dismiss.
15             The defendant's position actually is
16   consistent with the position plaintiff describes to the
17   insurances services office during the regulatory
18   process and it's clear when you look at the language
19   and consistent with those representations that were
20   made.  Blackboard notes in Section 1 of the motion that
21   there's no coverage for losses from Government orders
22   to prevent COVID-19 spread and that's even before the
23   virus's exclusion is considered.  But what's most
24   important on this theory is that regulatory estoppel
25   does not void clear and unambiguous language provisions

12

1   or provide a basis for recision.
2           So, as I've said here many times, when the
3   Court looks at the plain, unambiguous language of this
4   policy coverage provisions, as well as the exclusion
5   provisions, it's clear that the declaratory judgment
6   action filed by the plaintiff herein must be dismissed
7   as a matter of law.  The dismissal will be with
8   prejudice because it's clear that any further discovery
9   on these claims would not impact how the Court decides
10  these legal issues.  So for those reasons, the Court
11  will grant the application.
12
13                  *  *  *  *  *
14
15
16
17
18
19
20
21
22
23
24
25

---

13

### C E R T I F I C A T I O N

I, KELLI R. PHILBURN, the assigned
transcriber, do hereby certify the foregoing transcript
of proceedings on CD, playback number 8:31:42 to
8:46:12, is prepared in full compliance with the
current Transcript Format for Judicial Proceedings and
is a true and accurate compressed transcript of the
proceedings as recorded, to the best of my ability.


/s/ Kelli R. Philburn
KELLI R. PHILBURN    AOC #587
J&J COURT TRANSCRIBERS, INC.   DATE: November 12, 2020

# Exhibit C

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

GOODWILL INDUSTRIES OF          )
CENTRAL OKLAHOMA, INC.,         )
d/b/a GOODWILL CAREER           )
PATHWAYS INSTITUTE,             )
                                )
          Plaintiff,            )
                                )
v.                              )          No.  CV-20-511-R
                                )
                                )
PHILADELPHIA INDEMNITY          )
INSURANCE COMPANY,              )
                                )
          Defendant.            )

## ORDER

Before the Court is Defendant Philadelphia Indemnity Insurance Company's ("PIIC") Motion to Dismiss. Doc. No. 8. Plaintiff, Goodwill Industries of Central Oklahoma, Inc. ("Goodwill"), filed a Response to PIIC's Motion (Doc. No. 13), and PIIC filed a Reply in Support of its Motion. Doc. No. 17. The Court finds as follows.

In considering a defendant's Motion to Dismiss under Rule 12(b)(6), the Court must determine whether the plaintiff's [Petition] contains enough "facts to state a claim to relief that is plausible on its face," and whether the factual allegations "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007) (citations omitted).

The Court must accept all the well-pleaded allegations of the Petition as true and must construe the allegations in the light most favorable to Plaintiff. *Twombly*, 550 U.S. at

1

555; *Alvarado v. KOB–TV, L.L.C.*, 493 F.3d 1210, 1215 (10th Cir. 2007). However, the Court need not accept as true those allegations that are conclusory in nature. *Erikson v. Pawnee Cty. Bd. of Cty. Comm'rs*, 263 F.3d 1151, 1154–55 (10th Cir. 2001). "[C]onclusory allegations without supporting factual averments are insufficient to state a claim upon which relief can be based." *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).

Goodwill is a not-for-profit corporation operating in various locations throughout central Oklahoma. Doc. No. 12, p. 2. PIIC is a Delaware corporation with its principal place of business in Pennsylvania. Doc. No. 1, ¶ 3.

Goodwill purchased a Commercial Lines Policy ("the Policy") underwritten by PIIC for the "period from May 1, 2019 to May 1, 2020." Doc. No. 1-1, p. 2. The Policy provides "Business Income" coverage for "the actual loss of Business Income you sustain due to the necessary 'suspension' of your 'operations' during the 'period of restoration.'" Doc. No. 1-4, p. 169. The "'suspension' must be caused by direct physical loss of or damage to property." *Id.* It provides similar coverage for "Extra Expenses" and for interruption by means of "Civil Authority." *Id.* at 169–70. The parties agree that any coverage is conditioned on Goodwill suffering a "direct physical loss of or damage to property" operated by Goodwill throughout central Oklahoma. Doc. No. 1-1, pp. 2–3.

Additionally, Goodwill alleges that "[PIIC] added an endorsement to the Policy that purports to exclude coverage for loss due to virus or bacteria." *Id.* p. 5. The endorsement is titled "Exclusion of Loss Due to Virus or Bacteria" ("Virus Endorsement"), and it "applies to all coverage under all forms and endorsements …, including … damage to buildings or personal property and … business income, extra expense, or action of civil

2

authority." Doc. No. 1-1, p. 100. It states that "[PIIC] will not pay for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease." Doc. No. 1-1, p. 100.

On March 15, 2020, the Governor of Oklahoma issued an Executive Order declaring a state of emergency as a result of the eighth case of the novel coronavirus ("COVID-19") in Oklahoma. *Id.* p. 3. Soon after, mayors in cities across central Oklahoma required the "suspension of non-essential businesses," causing Goodwill to close its locations in each respective city. *Id.*

Goodwill sought a declaratory judgment in the District Court of Cleveland County on May 6, 2020 that "[it] sustained a 'direct physical loss' and/or 'risk of direct physical loss'" from the mandated closures. Doc. No. 1-1. On June 1, 2020, PIIC removed this action from state court.

Goodwill argues that it alleged a direct physical loss because the government-mandated COVID-19 closures caused it to "sustain[] direct physical loss or damage to its property … covered by the Policy," and further, that PIIC cannot rely on the Virus Endorsement because it was added to the Policy without consideration and is therefore void. *Id.* pp. 5, 7. PIIC argues, however, that the Policy does not cover the losses resulting from the closures because Goodwill never suffered a direct physical loss, and even if it did, the Virus Endorsement excludes its recovery.[1] Doc. No. 8, pp. 12, 14.

---

[1] PIIC also alleges that the Complaint fails to meet Rule 8's pleading requirement, arguing that a Complaint must contain "a short and plaint statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The Court finds that a short and plain statement was properly pled. PIIC also argues that Goodwill's "threadbare conclusions are insufficient to state a claim," Doc. No. 8, p. 10, and the Court addresses such allegations throughout its analysis of PIIC's Rule 12(b)(6) discussion, Doc. No. 8, pp. 12–20.

As discussed above, the Policy entitles Goodwill to "various forms of coverage, such as business income, extra expense, and interruption by civil authority," Doc. No. 13, p. 7, and Goodwill and PIIC agree that "[a]ll of these coverages require direct physical loss of or damage to Goodwill's property." Doc. No. 13, p. 7; Doc. No. 1-1, ¶¶ 6–11. However, "[n]either 'risk of direct physical loss' nor 'direct physical loss' is defined in the Policy," Doc. No. 1-1, ¶ 7, and the parties dispute its definition.

PIIC argues that a direct physical loss is a "demonstrable, physical *alteration* of the property," which necessarily "exclude[s] alleged losses that are intangible or incorporeal and … unaccompanied by a distinct … alteration of the property." Doc. No. 8, p. 15 (quoting 10A Couch on Ins. § 148:46) (emphasis in original). Goodwill counters that a direct physical loss results when "property is rendered unusable for its intended purpose." Doc. No. 13, p. 8 (citing *Western Fire Ins. Co. v. First Presbyterian Church*, 437 P.2d 52, 39 (Colo. 1968); *Matzner v. Seaco Ins. Co.*, No. CIV.A.96-0498-B, 1998 WL 566658 at *4 (Mass. Super. 1998)).

Importantly, Goodwill does not allege that COVID-19 infected its premises, but rather that its loss of income arose from the suspension of its business in compliance with the Governor's Executive Order. Doc. No. 1-1, ¶ 18. Without a definition in the policy, direct physical loss "is accorded its ordinary, plain meaning and enforced so as to carry out the parties' intentions." *Bituminous Cas. Corp. v. Cowen Const., Inc.*, 55 P.3d 1030, 1033 (Okla. 2002) (citing *Phillips v. Estate of Greenfield*, 859 P.2d 1101, 1104 (Okla. 1993)).

"The interpretation of an insurance contract and whether it is ambiguous is determined by the [C]ourt as a matter of law." *Serra v. Estate of Broughton*, 364 P.3d 637,

641 (Okla. 2015). The Court shall not "force[ ] or constrain[ ] interpretations to create …
[or] construe ambiguities." *Max True Plastering v. U.S. Fid. & Guar Co.*, 912 P.2d 861,
869 (Okla. 1996). Each party is free to contract as it wishes and is bound by the terms of
the agreement. *See Bennett v. The Preferred Acc. Ins. Co. of N.Y.*, 192 F.2d 748, 751 (10th
Cir. 1951) (interpreting a liability policy in Oklahoma). Further, "the Court will not
undertake to rewrite … nor make … either party a better contract than the one … executed."
*Bituminous*, 55 P.3d 1030 at 1033 (citing *Max True Plastering*, 912 P.2d at 869).

The Oklahoma Supreme Court has explained that "terms of an insurance policy
must be considered not in a technical but in a popular sense, and … according to their
. . . accepted use in common speech." *Serra*, 364 P.3d at 642 n. 6 (Okla. 2015) ((citing
*Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987) (quoting *Nat'l Aviation
Underwriters, Inc. v. Altus Flying Serv., Inc.*, 555 F.2d 778, 782 (10th Cir. 1977))).

PIIC's proffered definition resembles the common use of the terms "direct,"
"physical," and "loss." The Oklahoma Supreme Court has relied on dictionary definitions
to provide the common usage of terms; *see, e.g.*, *U. S. Fid. & Guar. Co. v. Briscoe*, 239
P.2d 754, 757 (Okla. 1951), and Merriam-Webster defines "direct" as "proceeding from
one point to another … without deviation or interruption" or as "stemming immediately
from a source," implying that a causal connection must exist. Merriam Webster,
https://www.merriam-webster.com/dictionary/direct (last visited Oct. 29, 2020).
"Physical" is defined as "having material existence" or as "relating to material things," and
a "loss" is defined as a "deprivation." Merriam Webster, https://www.merriam-
webster.com/dictionary/physical (last visited Oct. 29, 2020); Merriam Webster,

https://www.merriam-webster.com/dictionary/loss (last visited Oct. 29, 2020). Thus, a direct physical loss results from an actual, or material, deprivation of Plaintiff's property, which closely aligns with PIIC's proffered definition explaining that the Policy only covers a "demonstrable, physical *alteration* of the property … [which] exclude[s] alleged losses that are intangible." Doc. No. 8, p. 15.

Goodwill urges the Court to adopt a more expansive definition of "direct physical loss." Doc. No. 13, p. 8. It argues that a direct physical loss includes a loss that renders "property unusable for its intended purpose." *Id.* (citing *Western Fire Ins. Co. v. First Presbyterian Church*, 437 P.2d 52, 55 (Colo. 1968)). In *Western Fire*, the Colorado Supreme Court explained that "because of the accumulation of gasoline around and under the church building[,] the premises became so infiltrated and saturated as to be uninhabitable," and thus caused a direct physical loss. *Western Fire*, 437 P.2d at 55. In two additional cases cited by Goodwill, the plaintiff alleged that a direct physical loss occurred because a physical substance entered the covered premises or somehow otherwise materially affected it. *See, e.g.*, *Travco Ins. Co. v. Ward*, 504 F. App'x 251 (4th Cir. 2013) (toxic gasses within drywall); *Matzner*, 1998 WL 566658, at *4 (carbon monoxide levels rendered building uninhabitable). Here, Goodwill did not allege that any substance entered its premises or damaged it, but only that the mandated closures rendered its premises unusable. Doc. No. 13, p. 8.

Goodwill did not allege a "direct physical loss" under the Policy because it only alleged an intangible loss to its property. Doc. No. 13, p. 8. Specifically, Goodwill alleged that "[a]s a result of this COVID-19 pandemic, Goodwill sustained direct physical loss of

6

or damage to its property and will continue to sustain direct physical loss of or damage to its property covered by the Policy….” Doc. No. 1-1, ¶ 18. As PIIC explains, Goodwill does not describe “how the spread of a communicable disease nationally caused tangible physical loss of or damage to any of [Goodwill’s] premises.” Doc. No. 8, p. 7.

In similar insurance coverage cases brought due to COVID-19 closures, district courts have repeatedly held that “direct physical loss” requires showing some “tangible damage.” *See, e.g.*, *Turek Enterprises, Inc. v. State Farm Mut. Auto. Ins. Co.*, No. 20-11655, 2020 WL 5258484, at *8 (E.D. Mich. Sept. 3, 2020) (interpreting direct physical loss as requiring “some tangible damage to Covered Property.”); *Mudpie, Inc. v. Travelers Cas. Ins. Co. of Am.*, No. 20-CV-03213-JST, 2020 WL 5525171, at *4 (N.D. Cal. Sept. 14, 2020) (“the damage contemplated by the Policy is physical in nature”) (quoting *Philadelphia Parking Auth. v. Fed. Ins. Co.*, 385 F. Supp. 2d 280, 287 (S.D.N.Y. 2005)); *but see Studio 417, Inc. v. Cincinnati Ins. Co.*, No. 20-CV-03127-SRB, 2020 WL 4692385, at *6 (W.D. Mo. Aug. 12, 2020) (finding that the plaintiffs adequately alleged a direct physical loss when they stated that “COVID-19 particles attached to and damaged their property, which made their premises unsafe and unusable.”). In *Malaube, LLC v. Greenwich Ins. Co.*, No. 20-22615-CIV, 2020 WL 5051581, at *1 (S.D. Fla. Aug. 26, 2020), the plaintiff had a policy providing business income and personal property insurance. The plaintiff closed its doors due to city-wide orders preventing restaurants from hosting patrons indoors, *id.*, and subsequently sought a declaratory judgment that it suffered a direct physical loss. *Id.* at 6–7. The district court held that the plaintiff’s allegations were insufficient because “interruption in business must be caused by some

7

*physical problem* with the covered property," and the plaintiffs alleged only that the city-wide orders caused its closure. *Id.* at 7 (quoting *Philadelphia Parking Authority*, 385 F. Supp. 2d at 288).

This Court agrees with the other district courts' holdings, finding that at a minimum, a plaintiff must allege that a substance entered its premises or attached to its surfaces to plead a "direct physical loss." *Studio 417*, 2020 WL 4692385, at *6. The district court in *Studio 417* concluded that the plaintiffs pled a "direct physical loss" when the plaintiffs alleged that "COVID-19 … attached to and deprived [p]laintiffs of their property." *Id.* at *4. The court ultimately denied the Defendant's motion to dismiss because the plaintiffs in *Studio 417* alleged a tangible loss. *Id.* Here, however, Goodwill only states that the government's mandated closures rendered it unusable, not that COVID-19 "attached to [or] deprived [it] of [its] property." *Id.*

Alleging a direct physical loss unambiguously requires a showing of tangible damage. Goodwill failed to allege it suffered any tangible damage, and therefore, its claim is subject to dismissal.

Even if the Court applied an expansive definition of direct physical loss, as Goodwill requests, its claim is still subject to dismissal because the Virus Endorsement expressly excludes coverage. The Virus Endorsement provides that "there is no coverage under such insurance for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease." Doc. No. 1-1, p. 32. By its terms, the exclusion applies because COVID-19 is a virus that "is capable of inducing physical distress, illness or disease." *Id.*

8

Goodwill alleges, however, that the unambiguous exclusion is inapplicable because it lacked consideration and it applies only in the event of "actual contamination" on the premises rather than "suspected contamination." Doc. No. 13, p. 18.

First, Goodwill argues that the Virus Endorsement lacks consideration. *Id.*, p. 3. It explains that "[i]t is unclear what additional facts PIIC would have liked Goodwill to plead on this issue. It is not possible, nor is it required, for Goodwill to plead facts proving a negative." *Id.* Notwithstanding whether it is "required … to … prov[e] a negative," Goodwill must plead facts that underlie its allegations. *See Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). Goodwill did not plead any facts explaining why the Virus Endorsement lacked consideration. Instead, Goodwill stated that "[a]t some point, [PIIC] added an endorsement to the Policy that purports to exclude coverage for loss due to virus or bacteria,"[2] Doc. No. 1-1, ¶ 12, followed by a legal conclusion—that "no consideration was provided to Goodwill." *Id.* The Court will not credit such conclusory allegations. *See Erikson*, 263 F.3d at 1154–55.

Goodwill additionally argues that the Virus Endorsement only applies in the event of "actual contamination" on the premises rather than "suspected contamination," Doc. No. 13, p. 18, but this argument defeats itself. First, the Virus Endorsement precludes coverage "resulting from" any virus "*capable* of inducing physical distress, illness or disease," indicating it would encompass a scenario where "suspected contamination" qualifies. Doc. No. 1-4, p. 26 (emphasis added). The mandated closures, which caused Goodwill to seek

---

[2] The Complaint does not clearly state when the endorsement was added.

declaratory judgment, resulted from the ability, or capability, of COVID-19 to "induc[e] physical distress, illness or disease." Thus, even if Goodwill alleged a Covered Loss, the Virus Endorsement would exclude coverage.

Other district courts have reached the same conclusion. In *Turek Enterprises, Inc. v. State Farm Mut. Auto. Ins. Co.*, No. 20-11655, 2020 WL 5258484, at *9 (E.D. Mich. Sept. 3, 2020), the district court held that even "assuming [p]laintiff has suffered an 'accidental direct physical loss to Covered Property,' the Virus Exclusion negates any coverage for [p]laintiff's loss of income or extra expense." The Virus Exclusion in *Turek* barred coverage for a loss caused by "[v]irus, bacteria or other microorganism that induces or is capable of inducing physical distress, illness, or disease," just like the Virus Endorsement here. *Turek*, 2020 WL 5258484, at *8.

Here, "the plain, unambiguous meaning of the Virus [Endorsement] … [also] negates coverage." *Turek*, 2020 WL 5258484, at *9. Therefore, COVID-19 clearly qualifies as a "virus" that caused Goodwill to close its doors, which bars coverage under the Virus Endorsement.

PIIC also argues that under *Katz v. Gerardi*, 655 F.3d 1212 (10th Cir. 2011), Goodwill is attempting to utilize improper claim-splitting. Doc. No. 8, p. 19. PIIC alleges Goodwill is seeking a declaration that it suffered a covered loss and if it is successful, that it will pursue a second action to determine the "amounts … due and owing." Doc. No. 8, p. 20. However, in *Katz*, the Court explained that the "test for claim splitting is […] whether the first suit . . . would preclude the second suit." 655 F.3d at 1218. Thus, until a second suit is pending, dismissing Goodwill's suit on claim splitting grounds is inappropriate.

10

In conclusion, Goodwill's claim is, as a matter of law, not covered by the Policy with PIIC because Goodwill did not suffer a direct physical loss. Furthermore, even if it did suffer a direct physical loss, the plain meaning of the Virus Endorsement expressly excludes Goodwill's claim from coverage. Therefore, Goodwill is not entitled to relief and PIIC's motion to dismiss is GRANTED in its entirety.

**IT IS SO ORDERED** on this 9th day of November 2020.

DAVID L. RUSSELL
**UNITED STATES DISTRICT JUDGE**

# Exhibit D

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **1210 McGAVOCK STREET** | ) | |
| **HOSPITALITY PARTNERS, LLC,** | ) | |
| **d/b/a ADELE'S RESTAURANT,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:20-cv-694** |
| | ) | **Judge Aleta A. Trauger** |
| **ADMIRAL INDEMNITY COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM</u>

This case is one of many nationwide challenging the denial of insurance coverage for business losses incurred as a result of governmental orders closing or limiting the operation of various businesses around the country, including restaurants, in efforts to stem the spread of the 2019 novel coronavirus ("COVID-19" or "coronavirus") after it was first recognized as a pandemic by the World Health Organization in March 2019. Now before the court is defendant Admiral Indemnity Company's Motion to Dismiss Complaint (Doc. No. 10), seeking judgment in its favor on the plaintiff's claims for a declaratory judgment and damages arising from the defendant's alleged breach of a commercial insurance policy when it denied the plaintiff's claim for coverage. For the reasons set forth herein, the motion will be granted, and this case will be dismissed.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff 1210 McGavock Street Hospitality Partners, LLC, d/b/a Adele's Restaurant ("Adele's" or "plaintiff") filed suit in the Chancery Court for Davidson County, Tennessee on July

15, 2020. (Compl., Doc. No. 1-2, at 4–19.[1]) Defendant Admiral Indemnity Company ("Admiral" or "defendant") promptly removed the case to this court on the grounds of diversity jurisdiction. (Doc. No. 1.)

The plaintiff owns and operates a restaurant in Nashville, Tennessee. In exchange for "substantial premiums," it purchased from Admiral a commercial property insurance policy ("Policy"), in effect from January 1, 2020 through January 1, 2021. (Policy, Doc. No. 11-1, at 2.) Adele's characterizes the policy as an "all risk" policy that "provides broad coverage for losses caused by any cause unless expressly excluded." (Compl. ¶ 23.)

On March 15, 2020, pursuant to a Declaration of Public Health Emergency adopted by the Board of Health for Metropolitan Nashville and Davidson County ("Metro"), the Chief Medical Director for Metro's Public Health Department issued an order limiting the plaintiff and other restaurants in Nashville to "half the capacity specified" in their "food service establishment permit[s]," effective March 17, 2020. (Compl. ¶ 3.) On March 20, 2020, the order was amended to prohibit the plaintiff and other restaurants from allowing any on-premises dining services "until further notice." (*Id.*; *see also* Amended & Restated Order 1, Doc. No. 1-2, at 20.) The amended order specifically did not prohibit restaurants from receiving call-in orders and offering curbside, take-out, drive-through, and delivery of prepared food and beverage. (Doc. No. 1-2, at 20.) In a subsequent order, effective March 23, 2020, the Metro Nashville Health Department issued a "Safer at Home Order," directing the closure of all "non-essential" businesses through May 10, 2020. (Compl. ¶¶ 4, 42.) Adele's alleges that this order required it to close and prohibited the public from accessing its restaurant, thereby causing the "necessary suspension of its operations"

---

[1] The defendant's attachment to the Notice of Removal includes all of the state court pleadings, not just the Complaint.

as contemplated by the "Civil Authority" clause of the Policy, discussed below. (Compl. ¶¶ 43, 44.) However, the April 1, 2020 Amended and Restated Order 3 attached to the Complaint specifically permitted restaurants to continue providing "take-out, window, drive-through or curb-side service," as long as they complied with "CDC guidance on social distancing and gathering sizes." (Doc. No. 1-2, at 22.) On May 11, 2020, restaurants and bars were permitted to provide on-premises dining at fifty percent capacity while maintaining social distancing. On May 23, 2020, Nashville restaurants were permitted to open at seventy-five percent capacity while still maintaining social distancing. In June 2020, restaurants were briefly permitted to reopen to full capacity before again being restricted to seventy-five percent. On July 3, Nashville went back to restricting restaurants to fifty percent capacity. (*Id.*) (These public health orders are collectively referred to, below, as the "closure orders.")

As a result of the closure orders, the plaintiff's ordinary business operations were substantially interrupted, and remain interrupted, resulting in significant lost revenues and forcing the plaintiff to furlough or lay off many of its employees. (Compl. ¶ 6.) Believing that the Policy covered it for loss attributable to business interruption, Adele's submitted a claim to Admiral following the March 15, 2020 closure order, which was denied by letter ("Denial Letter") dated April 10, 2020. (Compl. ¶ 9; *see also* Denial Letter, Doc. No. 1-2, at 39.)

As set forth in the Denial Letter, Admiral's denial of the claim submitted by Adele's was premised, first, upon the defendant's interpretation of the Policy's coverage for loss of Business Income, which states as follows:

> We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration." The "suspension" must be caused by direct physical loss of or damage to property at premises [covered by the Policy]. The loss or damage must be caused by or result from a Covered Cause of Loss . . . .

(Doc. No. 1-2, at 40; *see also* Policy, Business Income (and Extra Expense) Coverage Form ¶ 1 ("Business Income Clause"), Doc. No. 11-1, at 57.) Admiral's Denial Letter stated that it had not received notice of "any physical damage" to the covered premises, based on which it concluded that there was "no coverage under the Policy for any loss of business income" resulting from curtailment of business operations due to restrictions imposed to prevent the spread of the coronavirus. (Doc. No. 1-2, at 40.)

Admiral also pointed to the Policy description of coverage for actions by "Civil Authorities," which states:

> When a Covered Cause of Loss causes damage to property other than property at the [covered] premises, we will pay for the actual loss of Business Income you sustain . . . caused by action of civil authority that prohibits access to the [covered] premises, provided that both of the following apply:
>
> (1) Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage, and the [covered] premises are within that area but not more than one mile from the damaged property; and
>
> (2) The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

(Doc. No. 1-2, at 40–41; *see also* Policy, Business Income (and Extra Expense) Coverage Form ¶ 5.a. ("Civil Authority Clause"), Doc. No. 11-1, at 58).) Admiral stated that this provision also did not provide coverage, because there was no physical damage from a covered cause of loss to other property, and no civil authority had limited physical access to the plaintiff's restaurant. (Doc. No. 1-2, at 41.)

The Denial Letter also relied on the Policy endorsement entitled "Exclusion of Loss Due to Virus or Bacteria," Form CP 01 40 07 06. (Doc. No. 1-2, at 41.) This Endorsement provides, in relevant part:

> A. The exclusion set forth in Paragraph B. applies to all coverage under all forms and endorsements that comprise this Coverage Part or Policy, including but not limited to forms or endorsements that cover property damage to buildings or personal property and forms or endorsements that cover business income, extra expense or action of civil authority.

> B. We will not pay for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease.

(Doc. No. 1-2, at 41; *see also* Policy, Exclusion of Loss Due to Virus or Bacteria ("Virus Exclusion Clause"), Doc. No. 11-1, at 80).)

Finally, the Denial Letter pointed to the "Causes of Loss – Special Form" of the Policy, defining the term "Covered Causes of Loss" to mean "Risks of Direct Physical Loss" unless the loss is expressly excluded by Section B, "Exclusion," or limited in Section C, "Limitations." (Doc. No. 1-2, at 42.) The referenced "Exclusions" paragraph excludes coverage for losses incurred as a result of "[a]cts or decisions . . . of any . . . governmental body." (Policy, Causes of Loss – Special Form ¶ B.3.b., Doc. No. 11-1, at 72.) Admiral explained that its decision to deny coverage was based on its understanding that

> the restaurant has temporarily curtailed its operations, in whole or in part, in response to the current public health emergency and related actions by governmental authorities to restrict public gatherings in an effort to prevent or mitigate the spread or effects of the coronavirus. . . .

> Because we have concluded that there exists no coverage for your claim as stated in the Notice of Loss, we have not investigated and have not addressed the issues of loss measurement and application of deductible.

(Doc. No. 1-2, at 42–43.)

The Complaint contests these reasons for the denial of coverage, but as a matter of contract interpretation rather than as a matter of contested facts. The plaintiff asserts that "[t]he Policy does not define the phrase 'direct physical loss of or damage to covered property'" (Compl. ¶ 25) and that the phrase "may be reasonably interpreted to occur when a covered cause of loss threatens or

renders property unusable or unsuitable for its intended purpose or unsafe for normal human occupancy and/or continued use" (Compl. ¶ 27). The plaintiff asserts that "[c]ontamination of the Plaintiff's property would be a direct physical loss requiring remediation to clean the surfaces of the Plaintiff's restaurant" and that there is an "ever-present risk that the Plaintiff's property is contaminated and will continue to be contaminated." (Compl. ¶¶ 39. 41.) The Complaint alleges that Nashville's closure orders were made "in direct response to the continued and increasing presence of the coronavirus on property on or around Plaintiff's premises" and that, by prohibiting the public from accessing the plaintiff's restaurant, the closure orders caused the suspension of its operations and triggered the "Civil Authority coverage" under the Policy. (Compl. ¶¶ 42, 43.)

The plaintiff also asserts that the Virus Exclusion Clause "does not apply to the 'business losses' incurred by Plaintiff here." (Compl. ¶ 34.) In support of this claim, it states, in an entirely conclusory fashion, that, insofar as the closure orders constitute "direct physical loss of or damage to" the covered premises, "the Virus Exclusion simply does not apply." (Compl. ¶ 49.) Second, it claims that, even if such direct physical loss or damage was caused by the coronavirus, the defendant should be estopped from enforcing the Virus Exclusion, based on "principles of regulatory estoppel, as well as general public policy." (Compl. ¶ 50.) Its "regulatory estoppel" argument is based on purported misrepresentations allegedly made by "insurance industry trade groups" in 2006 in order to persuade state insurance regulators to permit insurers to adopt virus exclusion clauses. (Compl. ¶¶ 51–57.)

The defendant has now filed it Motion to Dismiss and supporting Memorandum of Law, along with a complete copy of the Policy. (Doc. Nos. 10, 11, 11-1.) Its arguments largely mirror those set forth in the Denial Letter, which are based on its interpretation of the wording in the Policy itself, but Admiral also posits that no Tennessee court has adopted the doctrine of regulatory

estoppel and that the Sixth Circuit has strongly indicated that it would not apply under Tennessee law.

The plaintiff has filed a Response (Doc. No. 16), basically reiterating the arguments made in the Complaint, and the defendant filed a Reply (Doc. No. 19).

## II.   STANDARD OF REVIEW

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002).

"In evaluating a motion to dismiss, we 'may consider the complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the complaint and are central to the claims contained therein.'" *Ryniewicz v. Clarivate Analytics*, 803 F. App'x 858, 863 (6th Cir. 2020) (quoting *Luis v. Zang*, 833 F.3d 619, 626 (6th Cir. 2016)). Accordingly, even though the plaintiff did not attach the complete Policy to the Complaint, the court may consider the Policy submitted with the defendant's Motion to Dismiss. *Accord Ryniewicz*, 803 F. App'x at 863–64 (affirming dismissal of breach of contract claim, based on the terms of the contract attached to the defendant's motion).

## III.   DISCUSSION

In this diversity case, the court applies substantive state law to questions involving contract interpretation. *See Mackey v. Judy's Foods, Inc.*, 867 F.2d 325, 328 (6th Cir. 1989). There is no dispute in this case that Tennessee law applies, and, under Tennessee law, "[t]he question of the extent of insurance coverage is a question of law involving the interpretation of contractual language." *Clark v. Sputniks, LLC*, 368 S.W.3d 431, 441 (Tenn. 2012). When the language of an

insurance policy is clear and unambiguous, the court is bound to give effect to that language. *Id.* at 441. Under Tennessee law, the court should read an insurance contract as a layperson would read it. *Paul v. Ins. Co. of N. Am.*, 675 S.W.2d 481, 484 (Tenn. Ct. App. 1984). "Where an all-risk insurance policy is involved, the insurer must show that an exclusion applies in order to avoid liability, and exclusionary clauses are to be strictly construed against the insurer." *Davidson Hotel Co. v. St. Paul Fire & Marine Ins. Co.*, 136 F. Supp. 2d 901, 905 (W.D. Tenn. 2001) (citations omitted).

The defendant basically makes three arguments in support of its Motion to Dismiss: (1) the Virus Exclusion Clause precludes recovery under the Policy altogether, even if the plaintiff's claims otherwise fell within the scope of covered claims; (2) even if the Virus Exclusion Clause does not apply, the plaintiff does not plausibly allege that it suffered "direct physical loss of or damage to property," as required for Business Income Clause; and (3) the plaintiff fails to allege that the closure orders actually had the effect of prohibiting access to the plaintiff's restaurant, as required by the Civil Authority Clause. The court finds that all of the defendant's arguments have merit.

## A.     The Virus Exclusion Clause

As set forth above, the Policy excludes coverage for "loss or damage caused by or resulting from any virus . . . or other microorganism that induces or is capable of inducing physical distress, illness or disease." (Doc. No. 1-2, at 80.) Even if the plaintiff could show that it suffered covered losses under either the Business Income Clause or the Civil Authority Clause, the Virus Exclusion Clause precludes coverage. This exclusion extends to "all coverage and endorsements" under the Policy, specifically including the endorsements covering property damage to buildings and those that cover "business income, extra expense or action of civil authority." (*Id.*)

The plaintiff insists that the exclusion does not apply here, because the restaurant's "business interruption" was not actually caused by the virus, since no employee or patron was ever known to test positive, and there is no "indication that the virus was present on the property." (Doc. No. 15, at 18.) Rather, its losses were caused by the closure orders. The defendant argues that there is no dispute that the closure orders "stemmed from the COVID-19 pandemic" (*see* Compl. ¶ 61) and were intended to disrupt the spread of the virus and, thus, that the virus is the true cause of the plaintiff's loss.

Numerous courts presented with the question have held that similar exclusions bar coverage for business losses stemming from closures implemented for the purpose of attempting to mitigate the spread of the coronavirus. For instance, the Eastern District of Michigan addressed a policy exclusion barring coverage for loss that would not have occurred but for some "[v]irus, bacteria or other microorganism that induces or is capable of inducing physical distress, illness, or disease." *Turek Enters., Inc. v. State Farm Mut. Auto. Ins. Co.*, No. 20-11655, 2020 WL 5258484, at *8 (E.D. Mich. Sept. 3, 2020). The plaintiff there, like the plaintiff here, argued that the virus exclusion did not apply, because its business loss was due, not to COVID-19, but to a closure order. The court was not persuaded:

> Plaintiff's contention that the Order was the "sole, direct, and only proximate cause" of Plaintiff's losses is refuted by the Order itself. The Order expressly states that it was issued to "suppress the spread of COVID-19" and accompanying public health risks. The only reasonable conclusion is that the Order—and, by extension, Plaintiff's business interruption losses—would not have occurred but for COVID-19. Plaintiff is therefore wrong to suggest that "whether the reason for the [Order] was preventing the spread of a virus or an asteroid spreading magic dust is irrelevant." If it were the latter, the Virus Exclusion would not apply.

*Id.* (internal record citations omitted); *accord Newchops Rest. Comcast LLC v. Admiral Indem. Co.*, Nos. 20-1869, 20-1869, 2020 WL 7395153, at *8 (E.D. Pa. Dec. 17, 2020) ("In an attempt to circumvent this exclusion, the insureds argue that the cause of their losses and damages is the

shutdown orders, not the COVID-19 virus. This effort fails."); *Mauricio Martinez, DMD, P.A. v. Allied Ins. Co. of Am.*, No. 220CV00401FTM66NPM, 2020 WL 5240218, at *2 (M.D. Fla. Sept. 2, 2020) (where the policy at issue contained an exclusion for loss or damage caused "directly or indirectly," by "[a]ny virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease," holding that, because the plaintiff dental practice's damages "resulted from COVID-19, which is clearly a virus, neither the Governor's executive order narrowing dental services to only emergency procedures nor the disinfection of the dental office of the virus is a 'Covered Cause of Loss' under the plain language of the policy's exclusion"); *Franklin EWC, Inc. v. Hartford Fin. Servs. Grp., Inc.*, No. 20-CV-04434 JSC, 2020 WL 5642483, at *2 (N.D. Cal. Sept. 22, 2020) ("Thus, as the loss was caused directly or indirectly by the virus, the Virus Exclusion applies under its plain and unambiguous language. . . . [U]nder Plaintiffs' theory, the loss is created by the Closure Orders rather than the virus, and therefore the Virus Exclusion does not apply. Nonsense.").

The plaintiff has located only one case holding to the contrary: *Urogynecology Specialist of Florida LLC v. Sentinel Ins. Co., Ltd.*, No. 6:20-cv-1174-Orl-22EJK, 2020 WL 5939172 (M.D. Fla. Sept. 24, 2020). In that case, the court denied the defendant insurance company's motion to dismiss the plaintiff's COVID-related breach of policy claims, finding that "several arguably ambiguous aspects of the Policy make determination of coverage inappropriate at this stage," particularly because certain "forms" referenced in the exclusion for loss caused by a "virus" were not included in the policy or provided to the court. *Id.* at *4. The court concluded that it could not construe the policy as a matter of law in the absence of those forms. *Id.*

The same considerations do not apply here, where the defendant produced the entire Policy with its Motion to Dismiss, and the plaintiff does not contend that any exclusions set forth in the

Policy are modified by forms that have not been produced to the court. The court finds that the clear and unambiguous language of the Virus Exclusion Clause precludes coverage of the plaintiff's claims. The language of the closure orders establishes that the orders would not have been issued were it not for the threat posed by the coronavirus, which is indisputably a virus. The plaintiff's loss thus "result[ed] from" the coronavirus, and the Virus Exclusion Clause applies.

The plaintiff attempts to avoid this conclusion by arguing that the doctrine of regulatory estoppel bars enforcement of the Virus Exclusion Clause. The plaintiff acknowledges that no Tennessee court has adopted the doctrine of regulatory estoppel. Tennessee courts have long held, however, that extrinsic evidence may not be introduced to modify the terms of an unambiguous contract. *See, e.g.*, *Indiv. Healthcare Specialists, Inc. v. BlueCross BlueShield of Tenn., Inc.*, 566 S.W.3d 671, 697 (Tenn. 2019) (holding that extrinsic evidence "may not be used to vary, contradict, or supplement the contractual terms in violation of the parol evidence rule"). The Sixth Circuit has declined to apply regulatory estoppel based on Kentucky law, which likewise does not allow the admission of extrinsic evidence to "vary the terms of an unambiguous contract." *Transam. Ins. Co. v. Duro Bag Mfg. Co.*, 50 F.3d 370, 373 (6th Cir. 1995) (citing *J. Walter Wright Lumber Co. v. Red Bird Timber Corp.*, 379 S.W.2d 721, 723 (Ky. 1964)).

In *Duro Bag*, the insured argued that the insurer should be estopped from relying on a "pollution exclusion clause because the insurance industry deliberately misrepresented the meaning of that clause to state regulators." *Id.* The Sixth Circuit stated: "Because we have concluded that the language of the policy is unambiguous, we decline to go behind the face of the policy and examine its drafting history." *Id.* The plaintiff here makes an identical argument: that the insurance industry as a whole misrepresented the meaning of virus exclusion clauses, during a nationwide effort in 2006 to obtain state insurance regulators' approval of the virus exclusion

clauses. (Compl. ¶¶ 51–56.) This court likewise declines to "go behind the face" of the Policy at issue here, where the Virus Exclusion Clause is unambiguous, and Tennessee law does not permit the introduction of extrinsic evidence under these circumstances.

The plaintiff also alleges in the Complaint that the defendant should be estopped from enforcing the Virus Exclusion Clause as a matter of "general public policy," without further explaining or supporting this position. (Compl. ¶ 50.) Admiral does not address public policy in its Memorandum, and the plaintiff, in its Response, asserts simply: "Defendant . . . does not address the allegations that the purported exclusion is also against public policy." (Doc. No. 16, at 20.) It provides no legal argument, in either the Complaint or its Response, as to why the Virus Exclusion Clause violates public policy. However, as the defendant points out in its Reply (Doc. No. 19, at 10 n.5), Tennessee courts have held that "'clearly worded exclusion[s]' that limit, but do not completely negate, other general provisions within a policy, are not contrary to public policy." *Setters v. Permanent Gen. Assur. Corp.*, 937 S.W.2d 950, 952 (Tenn. Ct. App. 1996) (citing *Beef N' Bird of Am., Inc. v. Continental Cas. Co.*, 803 S.W.2d 234, 237 (Tenn. Ct. App. 1990)). The Virus Exclusion Clause does not negate the general coverage provided by the Policy and does not violate Tennessee public policy.

Because the Virus Exclusion Clause clearly precludes coverage for the business losses incurred by Adele's, the defendant is entitled to judgment in its favor as a matter of law on both the breach of contract claim and the claim for declaratory relief, which itself would require a finding that the defendant breached the Policy by denying relief.

### B.    The Business Income Clause

Even if the Virus Exclusion Clause did not apply, the court also finds that the plaintiff's claim falls outside the terms of the Business Income Clause of the Policy, which expressly provides coverage only for "direct physical loss of or damage to Covered Property" at the plaintiff's

premises "caused by or resulting from any Covered Cause of Loss." (Doc. No. 11-1, at 30.) More specifically, the defendant agreed to

> pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration." The "suspension" must be caused by *direct physical loss of or damage to property* at premises [covered by the Policy]. The loss or damage must be caused by or result from a Covered Cause of Loss . . . .

(*Id.* at 57 (emphasis added).) The plaintiff cannot show that the closure orders—or the coronavirus itself—caused "direct physical loss of or damage to Covered Property." (*Id.* at 30.)

The plaintiff argues that the Policy does not define the terms "physical," "loss of," or "damage to" and that, under Tennessee law, the court must interpret these terms "fairly and reasonably, giving the language its usual and ordinary meaning." (*Id.* at 6 (quoting *Travelers Indem. Co. of Am. v. Moore & Assocs., Inc.*, 216 S.W.3d 302, 306 (Tenn. 2007)).) Quoting various dictionary definitions, which are not contested, the plaintiff posits that "physical" generally means to have an objective, material, perceptible existence, as opposed to imaginary, fictitious, or pertaining to the imagination, soul, or emotions. (*Id.* at7 (citations omitted).) It also points out that dictionaries define "loss" and "damage" to include both physical damage to property as well as the loss of use or income and reduction in value, usefulness or normal function. (*Id.* (citations omitted).)

From there, its argument becomes more vague and even less convincing. It contends, without explanation, that it has adequately "alleged that its property has suffered physical damage and loss in all forms, including alteration to its structure, composition, or form *and* loss of access, loss of use, and loss of functionality." (*Id.* at 8 (citing Compl. ¶ 41).) In the referenced paragraph of the Complaint, Adele's alleges that "[t]he continuous presence of the coronavirus on or around Plaintiff's premises rendered the premises unsafe, uninhabitable, and substantially unsuited for its intended use and, therefore, caused physical property damage or loss under the Policy." (Compl.

¶ 41.) Elsewhere, however, the plaintiff itself effectively concedes that the virus did not cause direct physical loss or damage, since, as it argues, no employee or patron of the restaurant tested positive for coronavirus, and "there is no indication that the virus was present on the property." (Doc. No. 16, at 18.)

Regardless, those courts that have considered a similar argument have almost unanimously rejected it. In particular, a recent opinion from the Eastern District of Pennsylvania, addressing claims against Admiral under an identically worded policy, found as follows:

> Admiral contends that the insureds must allege some distinct, demonstrable, physical alteration of the insured properties . . . to satisfy the "damage to property" requirement. It argues that the policy covers only tangible, physical damage, such as a structural change, not economic damage. Citing the "physical loss of or damage to property" language appearing only in the business income provision, the insureds counter that a loss of functionality, usability or habitability is sufficient.
>
> Property damage is "a distinct, demonstrable, physical alteration of the property." 10A Couch on Ins. § 148.46 (3d ed. 1995) (citations omitted). Pure economic losses are intangible and do not constitute property damage. 9A Couch on Ins. § 129.7.
>
> Reading the . . . business income provisions in the context of the entire policy, we conclude that the damage must be physical. . . .
>
> The business income provision covers losses sustained by the suspension of operations during the "period of restoration." This term is given special meaning in the policy. It is defined as ending "when the property . . . should be repaired, rebuilt or replaced." This definition informs that the loss or damage to the property must be physical, affecting the structure of the property. It speaks to the time to "repair, rebuild or replace" the property, terms connoting structure.
>
> There was no physical damage to the insureds['] properties alleged in the amended complaints. Thus, because they have not alleged facts showing . . . "a direct physical loss of or damage to" their own properties, the insureds have not established coverage under the civil authority or the business income provisions.

*Newchops Rest.*, 2020 WL 7395153, at \*4–5 (internal citations and footnotes omitted).

Similarly, in *Turek Enterprises*, the plaintiff argued that the term "'physical loss to Covered Property' includes the inability to use Covered Property." 2020 WL 5258484, at \*6. The court

acknowledged that this interpretation might be "consistent with one definition of 'loss'" but that such an interpretation would

> ultimately render[] the word "to" meaningless. "To" is used here as a preposition indicating contact between two nouns, "direct physical loss" and "Covered Property." Accordingly, the plain meaning of "direct physical loss to Covered Property" requires that there be a loss *to* Covered Property; and not just any loss, a *direct physical loss*.

*Id.* (footnotes and citations omitted; emphasis in original).

The court agrees with both of these assessments, and both apply equally well here, even though the Policy uses the preposition "of" ("loss of") instead of "to." The plaintiff has certainly suffered economic loss, but it is unable to show that it has suffered "direct physical loss *of* or damage *to*" the premises or property covered by the Policy. Consequently, its reliance on *Studio 417, Inc. v. Cincinnati Insurance Co.*, No. 20-cv-03127-SRB, 2020 WL 4692385 (W.D. Mo. Aug. 12, 2020) (Bough, J.) (and other opinions issued by the same judge) is unpersuasive.

In *Studio 417*, the plaintiffs also alleged business interruption losses arising from coronavirus-related closure orders that their insurer refused to compensate. The court denied the defendant's motion to dismiss, finding that the plaintiffs had "adequately alleged a direct physical loss." *Id.* at *4. *Studio 417* is distinguishable from this case, because the policy in that case covered losses arising from "accidental physical loss *or* accidental physical damage to property." *Id.* at *5 (emphasis original). According to the court, the defendant's insistence on a showing of tangible damage "conflat[ed] 'loss' and 'damage'" and was inconsistent with "giv[ing] meaning to both terms." *Id.* Moreover, the plaintiffs "plausibly alleged that COVID-19 particles attached to and damaged their property." *Id.* at *6. By contrast, in this case, Adele's specifically asserts that "there is no indication that the virus was present on the property" (Doc. No. 16, at 18), and Admiral's proposed interpretation would not make the phrase "direct physical loss" redundant. The analysis in *Studio 417* has no application here.

The plaintiff's reliance on *Southeast Mental Health Center, Inc. v. Pacific Insurance Co.*, 439 F. Supp. 2d 831, 837 (W.D. Tenn. 2006), is similarly unavailing. Based on that case, the plaintiff claims that, under Tennessee law, "a loss of functionality" constitutes "physical damage." (Doc. No. 16, at 8.) The plaintiff in that case was a non-profit facility that provided outpatient mental health services and substance abuse treatment. It suffered business interruption of several weeks and consequent economic losses due to storm-related electrical and telephone outages; it also alleged that the power outage "damaged its pharmacy computer . . . which resulted in the loss of data from the computer" and rendered it unable to fill patients' prescriptions, thus also causing loss. *Se. Mental Health Ctr.*, 439 F. Supp. 2d at 833. The policy at issue in that case, like the Policy here, provided coverage for necessary suspension of business operations "caused by direct physical loss of or damage to property at the [covered] premises." *Id.* at 836. The court held that "the words 'direct physical' modify both 'loss of' and 'damage to.'" *Id.* at 837. Although the power outage clearly caused business interruption and thus economic loss, it was also undisputed that "the electrical and telephone outages were caused by damage to power and utility lines that were not located on Plaintiff's property." *Id.* at 837. The court held that "the power outage therefore does not constitute 'direct physical loss of or damage to' Plaintiff's property." *Id.* at 837.

On the other hand, the court also found that "corruption of the pharmacy computer" caused by the power outage did "constitute[] 'direct physical loss of or damage to property.'" *Id.* at 838. Specifically with respect to the damage to the computer—a physical object on the covered premises—the court held that the term "'physical damage' is not restricted to the physical destruction or harm of computer circuitry but includes loss of access, loss of use, and loss of functionality." *Id.* (quoting *Am. Guarantee & Liab. Ins. Co. v. Ingram Micro, Inc.*, No. CIV. 99-185 TUC ACM, 2000 WL 726789, at *2 (D. Ariz. Apr. 18, 2000)). Notably, the court did not

apply the same reasoning to the plaintiff's complete "loss of use" of its facility during the power outage or the facility's "loss of functionality" resulting from the power outage. Rather, loss of functionality was considered to be physical damage only insofar as it related to a physical object located on the covered premises. This case does not come to the plaintiff's aid.

Although there is no dispute that the closure orders resulted in suspension of Adele's business operations, such suspension was not "caused by direct physical loss of or damage to property at [the covered] premises." (Doc. No. 11-1, at 57.) Consequently, Adele's loss is not covered by the Business Income Clause.

### C.      Civil Authority Clause

Finally, Adele's also argues that its loss is covered by the Civil Authority Clause, because its loss is the "'direct' result of the governmental orders which rendered Adele's property unusable for its intended purpose." (Doc. No. 16, at 8.) More specifically, it claims that it suffered a "physical loss of covered property including loss of access, use and functionality of the dining area for its intended purposes." (*Id.*) The cases to which it cites in support of this argument all involve some physical damage to the covered property, including landslides, pooling gasoline, and asbestos fibers rendering the structure uninhabitable. (*See id.* at 9–10.[2]) It also cites to *Southeast Mental Health Center*, again for the proposition that "a loss of functionality" constitutes "physical damage," a premise the court has already rejected. None of these cases supports the conclusion that the plaintiff's loss in this case is covered by the Civil Authority Clause.

More specifically, in order for the Civil Authority Clause to apply,

---

[2] *See Hughes v. Potomac Ins.*, 18 Cal. Rptr. 650 (Cal. Ct. App. 1962) (landslide); *W. Fire Ins. v. First Presbyterian Church*, 437 P.2d 52 (Colo. 1968) (pooling gasoline under and around structure); *Sentinel Mgmt. Co. v. New Hampshire Co.*, 563 N.W.2d 296 (Minn. Ct. App. 1997) (contamination of structure due to asbestos fibers).

> (1) a "Covered Cause of Loss" must cause "damage to property other than property at the [covered] premises," which
>
> (2) results in "action by civil authority," and
>
> (3) "[a]ccess to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage, and the [covered] premises are within that area but not more than one mile from the damaged property," and
>
> (4) "action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property."

(Doc. No. 11-1, at 58.)

The plaintiff's arguments notwithstanding, this provision does not apply, because (1) the coronavirus did not cause property damage, meaning actual physical damage, and the Complaint does not actually even allege property damage to some neighboring property; (2) the closure orders, which certainly constitute "action by civil authority," were issued to control the spread of the coronavirus by limiting close human interaction, not because of "dangerous physical conditions" at a neighboring property—and, again, the plaintiff does not allege an actual case of "dangerous physical conditions" at another location; and (3) the closure orders did not prohibit physical access to the plaintiff's restaurant or the area around it. The most natural reading of "access," in this context, is physical access, not simply being closed to the public. The plaintiff does not allege that it was ever physically unable to access the restaurant.

Thus, the plaintiff's loss would not be covered by this provision, even if the Virus Exclusion Clause did not apply.

## IV.   CONCLUSION

For the reasons set forth herein, the court will grant the Motion to Dismiss.

The plaintiff requests that, if the court is inclined to grant the motion, it be granted leave to amend the Complaint, particularly to enable it to "more completely set out the doctrine" of

regulatory estoppel and the facts relating to its "other causes of action." (Doc. No. 16, at 20.) The court construes this as a request that the dismissal of the claims be without prejudice rather than with prejudice.

Because the court finds as a matter of law that the doctrine of regulatory estoppel does not apply, additional pleading would not salvage the claim. Likewise, because the conclusion that the plaintiff's causes of action for breach of contract and for a declaratory judgment fail as a matter of law based on the plain language of the Policy, further amendment of the factual allegations or clarification of the causes of action would not enable the claims to proceed. The dismissal of the Complaint, therefore, will be with prejudice. An appropriate Order is filed herewith.

_____

ALETA A. TRAUGER
United States District Judge

# Exhibit E

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

LJ NEW HAVEN LLC, d/b/a LENNY & JOE'S FISH
TALE, Individually and on Behalf of All Others
Similarly Situated,

      Plaintiff,

v.

AMGUARD INSURANCE COMPANY

      Defendant

No. 3:20-cv-00751 (MPS)

## RULING ON MOTION TO DISMISS

In March 2020, an executive order issued by Governor Ned Lamont (the "Order") in
response to the COVID-19 pandemic mandated that restaurants in Connecticut cease in-person
dining operations to help prevent the further spread of the disease. ECF No. 13 ¶ 30. Plaintiff,
which operates a restaurant in New Haven, Connecticut, sustained a loss of business as a result,
and sought "business interruption" coverage from its insurance provider, AmGUARD Insurance
Company ("Defendant"). Defendant denied coverage, and Plaintiff, seeking to represent a class
of Defendant's policyholders, brought this action for breach of contract and for a declaratory
judgment that Defendant was required to afford coverage under three separate provisions of the
policy for revenues Plaintiff lost following the issuance of the Order. Arguing that the policy's
virus exclusion forecloses coverage for Plaintiff's losses, and that the terms of the policy's
insuring provisions on which Plaintiff relies do not afford such coverage in any event, Defendant
now moves to dismiss Plaintiff's claims. Because I agree that the virus exclusion applies, the
motion to dismiss is GRANTED.

## I.    FACTUAL BACKGROUND

1

The following facts are drawn from Plaintiff's Amended Complaint, ECF No. 13, and are accepted as true for the purposes of this ruling. I also consider the insurance policy, on which the Amended Complaint relies, and the Order, on which it also relies and which is in any event judicially noticeable. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002) (On a Rule 12(b)(6) motion, "the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference. Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint." (internal quotation marks and citations omitted); *Staehr v. Hartford Financial Services Group, Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) (On Rule 12(b)(6) motion, "the court may also consider matters of which judicial notice may be taken" (internal quotation marks omitted)); *Frith v. Hill*, No. 07-cv-5899, 2009 WL 3073716, at *16 n. 10 (S.D.N.Y. Sept. 23, 2009) ("[J]udicial notice may be taken of the rules, regulations and orders of administrative agencies issued pursuant to their delegated authority.").

### A. Factual Allegations in the Amended Complaint

Plaintiff is a Connecticut limited liability company that operates the Lenny & Joe's Fish Tale restaurants, which were forced to cease indoor-dining operations in March 2020 when the Governor of Connecticut issued Executive Order No. 7D ("Order"). ECF No. 13 ¶¶ 14, 15.[1] The Order "confirmed [the] spread in Connecticut" of the "coronavirus disease 2019 (COVID-19) … a respiratory disease that spreads easily from person to person and may result in serious illness or death…." ECF No. 14-6 at 2. The initial cluster of COVID-19 patients "was found to be linked

---

[1] The Amended Complaint refers to "Closure Orders" generally, and at one point refers to the impact of Closure Orders in New Jersey, rather than Connecticut, in what is presumably a typo. ECF No. 13 ¶ 31, 46. In the briefing, however, Plaintiff confirms that it was Governor Lamont's Order 7D that led its business to shut down indoor dining. ECF No. 18 at 6.

to the Huanan seafood market in Wuhan, China, where many non-aquatic animals such as birds were also on sale." ECF No. 13 ¶ 19. On January 13, 2020, "[t]he first confirmed case of the virus outside China was diagnosed" in Bangkok, Thailand, and by "April 23, 2020, the [World Health Organization] reported a confirmed 2.5 million cases of COVID-19 globally and over 170,000 deaths, with the United States dealing with more than 800,000 confirmed cases and 40,000 deaths – more than any other country." *Id.* ¶¶ 19, 21. "Data from published studies" have shown that "COVID-19 is primarily transmitted from symptomatic people to others who are in close contact through respiratory droplets, by direct contact with infected persons, or by contact with contaminated objects and surfaces." *Id.* ¶ 23. Specifically, a study "in *The New England Journal of Medicine*," showed that "COVID-19 was detectable in aerosols for up to three hours, up to four hours on copper, up to 24 hours on cardboard, and up to two to three days on plastic and stainless steel. All of these materials are used in the preparation and service of food by restaurants." *Id.* ¶ 26 (footnote omitted).

Risk of exposure "is particularly acute in places the public gathers typically to socialize, eat, drink, shop, be entertained, and go for recreation." *Id.* ¶ 30. In order to "to slow transmission of the virus" and "mitigate the spread of COVID-19 infections throughout the state and region," the Governor issued the Order, which limited the size of gatherings, closed betting facilities, and placed restrictions on establishments including, but not limited to, restaurants, gyms, and movie theaters. ECF No. 14-6 at 3-4. Restaurants, the Order provided, "shall only serve food or non-alcoholic beverages for off-premises consumption." The requirement that restaurants cease operations for in-person dining, limiting them to "take-out and delivery," prevented Plaintiff from being able "to use [its] property for its intended purpose." *Id.* at 3, ECF No. 13 ¶¶ 31, 41. Plaintiff does not allege that its property was actually contaminated by the

virus that causes COVID-19 and in its brief specifically disavows any notion of such contamination. ECF No. 18 at 9-10 ("Here, there has been no infestation or contamination of Fish Tale's property by coronavirus, nor are there any allegations in the Amended Complaint that would support such an assumption. Fish Tale's loss was not caused by [a]n infestation or contamination of coronavirus, or any other virus, at Fish Tale's property.").

Plaintiff's commercial insurance policy with Defendant provided coverage "for the policy period of September 4, 2019, through September 4, 2020." *Id.* ¶ 17. "Among the coverages provided by the [p]olicy [are] business interruption insurance," coverage for "extra expense," and coverage for certain losses resulting from the exercise of "civil authority." *Id.* ¶¶ 34, 37, 39. The policy covers "loss or damage to the covered premises resulting from all risks other than those expressly excluded." *Id.* ¶ 32. The policy "contains an exclusion for losses caused by [a]ny virus." *Id.* ¶ 43. Defendant "does not intend to cover losses caused by the Closure Orders as part of business interruption coverage" and has "denied similar claims by other class members across-the-board…." *Id.* ¶ 47. As a result, Plaintiff seeks a

> declaratory judgment that affirms that the COVID-19 pandemic and the corresponding response by civil authorities to stop the spread of the outbreak triggers coverage, has caused physical property loss and damage to the insured property, provides coverage for future civil authority orders that result in future suspensions or curtailments of business operations, and finds that Defendants are liable for the losses suffered by policyholders.

*Id.* ¶ 9. Specifically, Plaintiff seeks a declaratory judgment as to three types of coverage in the policy: (1) Business Income Coverage (Count One); (2) Civil Authority Coverage (Count Three); and (3) Extra Expense Coverage (Count Five). *Id.* at 21, 24, 26.

Plaintiff also claims that Defendant has breached its contractual obligation under the policy  to indemnify "Plaintiff and others similarly situated for business losses and extra expenses resulting from actions taken by civil authorities to stop the human to human and

surface to human spread of the COVID-19 outbreak." *Id.* ¶ 10. Plaintiff thus asserts three breach of contract claims that parallel its declaratory judgment claims: (1) Business Income Coverage (Count Two); (2) Civil Authority Coverage (Count Four); and (3) Extra Expense Coverage (Count Six). *Id.* at 22, 25, 27.

###### B. **The Policy**

The policy, entitled "Businessowner's Coverage Form" and attached to the defendant's brief, opens, under "Section I – Property," with the following sentence: "We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss." ECF No. 14-2 at 7. "Covered Property" includes buildings, fixtures, and "Business Personal Property," among others, and "Business Personal Property" includes "[p]roperty you own that is used in your business," among others. *Id.* The "premises described in the Declarations" refers to designated buildings in New Haven listed on the declarations pages, which also specify coverage limits for "business personal property," "equipment breakdown," "valuable papers and records," and "accounts receivable," among others. *Id.* at 59-65. Under "Covered Causes of Loss," the policy states "[r]isks of physical loss unless the loss is: a. Excluded in Paragraph B. Exclusions in Section I; or b. Limited in Paragraph 4. Limitations in Section I."

Under "Additional Coverages," the policy provides coverage for "Business Income," as follows:

> f. Business Income
> (1) Business Income
> (a) We will pay for the actual loss of Business Income you sustain due to the necessary suspension of your "operations" during the "period of restoration". The suspension must be caused by direct physical loss of or damage to property at the described premises. The loss or damage must be caused by or result from a Covered Cause of Loss. With respect to loss of or damage to personal property in the open or personal property in a vehicle,

5

the described premises include the area within 100 feet of the site at which the described premises are located.

ECF No. 14-2 at 11.

Also under "Additional Coverages," the policy covers "Extra Expense" as follows:

g. Extra Expense
(1) We will pay necessary Extra Expense you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss or damage to property at the described premises. The loss or damage must be caused by or result from a Covered Cause of Loss. With respect to loss of or damage to personal property in the open or personal property in a vehicle, the described premises include the area within 100 feet of the site at which the described premises are located.

*Id.* at 13.

The final "Additional Coverage" at issue in this case is the policy's coverage of loss of

business income and necessary extra expenses caused by action of civil authority as follows:

    i.       Civil Authority

When a Covered Cause of Loss causes damage to property other than property at the described premises, we will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises, provided that both of the following apply:
(1) Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage, and the described premises are within that area but are not more than one mile from the damaged property; and
(2) The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

*Id.* at 13-14.

    Section I, Paragraph B. – Exclusions, which, as noted, is referred to in the definition of

"Covered Cause of Loss," includes the following language:

We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss. These exclusions apply whether or not the loss event results in widespread damage or affects a substantial area.
….

j. Virus Or Bacteria
(1) Any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease.

*Id.* at 20, 23.

## II.   LEGAL STANDARD

On a motion to dismiss under 12(b)(6), the Court must determine whether plaintiffs have alleged "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ray v. Watnick*, 688 F. App'x 41, 41 (2d Cir. 2017) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations and internal quotation marks omitted)). While the Court must accept as true the factual allegations in the complaint and "draw all reasonable inferences in favor of the non-moving party," *Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co.*, 517 F.3d 104, 115 (2d Cir. 2008), it must grant the moving party's motion if "a complaint is based solely on wholly conclusory allegations and provides no factual support for such claims. . . ." *Scott v. Monroe*, 306 F.Supp.2d 191, 198 (D. Conn. 2004). "Accordingly, 'threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'" *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) (quoting *Ashcroft*, 556 U.S. at 678) (brackets omitted).

## III.   DISCUSSION

Defendant moves to dismiss the entire Amended Complaint under Fed. R. Civ. P. 12(b)(6) on the grounds that: (1) the policy's virus exclusion forecloses coverage because the losses were caused, either directly or indirectly, by the virus; (2) a loss of income or expense caused by the Order does not trigger coverage under the policy because the property did not

7

sustain a "direct physical loss"; and (3) coverage is not triggered under the civil authority

provision because Plaintiff has failed to allege "damage to property." [2] Because I agree with

Defendant's first argument and find that the virus exclusion forecloses all of Plaintiff's claims, I

do not reach Defendant's remaining arguments.

## A.     Policy Interpretation

Under Connecticut law,[3] "construction of a contract of insurance presents a question of

law for the court." *Connecticut Medical Ins. Co. v. Kulikowski*, 942 A.2d 334, 338 (Conn. 2008)

(internal quotation marks and alteration omitted). "An insurance policy is to be interpreted by

the same general rules that govern the construction of any written contract. In accordance with

those principles, the determinative question is the intent of the parties, that is, what coverage the

... [insured] expected to receive and what the [insurer] was to provide, as disclosed by the

provisions of the policy.... If the terms of the policy are clear and unambiguous, then the

language, from which the intention of the parties is to be deduced, must be accorded its natural

and ordinary meaning…. When interpreting an insurance policy, [the court] must look at the

contract as a whole, consider all relevant portions together and, if possible, give operative effect

to every provision in order to reach a reasonable overall result." *Id.* (internal citations, quotation

marks, and alterations omitted). Courts should not "torture words to import ambiguity" when the

ordinary meaning is not ambiguous, and any ambiguity "must emanate from the language used in

---

[2] Amicus, Kaiaffa, LLC d/b/a Chip's Family Restaurant's submitted a brief in opposition to Defendant's motion to dismiss (ECF No. 28) and participated in oral argument before this Court.

[3] I apply Connecticut law because the court is sitting in diversity; both parties cite Connecticut law to support their positions; and neither party has asserted that the law of another jurisdiction applies. *See Johnson v. Priceline.com, Inc.*, 711 F.3d 271, 276 n. 2 (2d Cir. 2013) ("[C]ourts sitting in diversity may properly rely on the forum state's law where neither party asserts that another jurisdiction's law meaningfully differs."). If Connecticut substantive law is "uncertain or ambiguous, the job of the federal court is carefully to predict how the highest court of the forum state would resolve the uncertainty or ambiguity." *Travelers Ins. Co. v. 633 Third Assocs.*, 14 F.3d 114, 119 (2d Cir. 1994).

the contract rather than from one party's subjective perception of the terms." *Karas v. Liberty Ins. Corp.*, 228 A.3d 1012, 1020 (Conn. 2019).

## B. **The Virus Exclusion**[4]

Defendant argues that coverage is precluded under the virus exclusion because the exclusion covers any loss "caused directly or indirectly" by a virus. ECF No. 14 at 10. Policy exclusions are "strictly construed in favor of the insured" and should only be construed against the insured if the court has "a high degree of certainty that the policy language clearly and unambiguously excludes the claim." *Liberty Mut. Ins. Co. v. Lone Star Ind., Inc.*, 967 A.2d 1, 22 (Conn. 2009).[5] The operative language of the virus exclusion provision states that, "We will not pay for loss or damage caused directly or indirectly by ... any virus ... that induces or is capable of inducing physical distress, illness or disease." The provision adds that "[s]uch loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss." ECF No. 14-2 at 20, 23. When this second sentence is combined with the "direct[] or indirect[]" causation language of the first sentence, it makes the causal scope of the virus exclusion broad and suggests that it should apply as long as a virus acts as a link somewhere in the causal chain producing the loss or damage at issue. That formulation is easily satisfied in this case.

The Amended Complaint describes the issuance of the Order as the immediate cause of Plaintiff's losses. ECF No. 13 at ¶¶ 3-4 (recognizing need to stop spread of COVID-19, States

---

[4] Defendant addresses the virus exclusion first in its brief, and I do the same and find that doing so makes it unnecessary to address Defendant's remaining arguments.

[5] The policy in this case incorporates the exclusion by reference in the opening insuring clause of the property coverage section of the policy. Specifically, as noted above, that clause states that "[w]e will pay for direct physical loss of or damage to Covered Property … caused by or resulting from any Covered Cause of Loss," and "Covered Cause of Loss" is defined to include "[r]isks of physical loss unless the loss is: a. Excluded in Paragraph B. Exclusions …. in Section I; ECF No. 14-2 at 7-8. Arguably, then, the exclusion limits the scope of the coverage in the first instance, rather than operating as a traditional exclusion. I nonetheless treat the virus exclusion as just that – an exclusion – and construe it in accordance with the principles set forth in the text above.

issued orders curtailing operations of non-essential businesses, which incurred catastrophic losses as a result). But the complaint traces the Order (and others like it) to the emergence of the virus and the need to stop its spread. *See id.* at ¶¶ 1-4 (after the WHO declared the COVID-19 outbreak a worldwide pandemic and the CDC advised the adoption of social social-distancing measures to stop the spread of COVID-19, "many state government administrations … recognized the need to take steps to protect the health and safety of their residents from human to human and surface to human spread of COVID-19," and "[a]s a result, many governmental entities entered civil authority orders suspending or severely curtailing business operations of non-essential businesses that interact with the public and provide gathering places for the individuals."); ¶ 30 (because the CDC's "recommendations have proven ineffective to minimize the spread of COVID-19, containment efforts have led to civil authorities issuing orders closing many business establishments, including restaurants …."). And the Order itself identifies as its very rationale COVID-19, the emergency conditions it has caused, and the consequent need to stop its spread. The Order states that "COVID-19 is a respiratory disease that spreads easily from person to person…" and to "reduce spread of COVID-19, the United States Centers for Disease Control and Prevention and the Connecticut Department of Public Health recommend implementation of community mitigation strategies to increase containment and to slow transmission of the virus." ECF No. 14-6 at 2-3. "Therefore," the Order limits restaurant dining to off-premise consumption and mandates that in-person dining operations cease. *Id.* at 3.

Plaintiff's allegations and the language of the Order make clear that while the virus may not be the "direct" cause of the curtailment of Plaintiff's operations and its consequent loss of income, it is surely an indirect cause. For starters, it cannot seriously be disputed — and Plaintiff does not dispute — that the virus is at least a "but for" cause of its loss, i.e., that loss would not

have been occurred had the virus never come into existence or infected human beings. And even if the principle of "strictly construing" insurance policy exclusions counsels against reading the broad causation language in the virus exclusion to embrace every link in the causal chain, no matter how remote from the loss incurred by the insured (e.g., Plaintiff's decision to establish a restaurant in the first place), remoteness is not an issue here. The causal links represented by the virus and the Order are interlocking – even intertwined. The language of the Amended Complaint and the Order quoted above makes clear that it was a short step from the emergence of the virus to the curtailment of Plaintiff's indoor dining operations. Further, Connecticut courts have recognized, and Plaintiff concedes, that the "anti-concurrent causation" clause in the virus exclusion, i.e., the statement that the exclusion applies "regardless of any other cause or event that contributes concurrently or in any sequence to the loss," displaces the "efficient proximate cause" analysis that would ordinarily apply when construing an insurance policy.[6] ECF No. 18 at 10 *citing Lombardi v. Universal North America Ins. Co.,* 2015 WL 600823, at *3, 13 (Conn. Sp. Ct. Jan. 21, 2015) (upholding validity of anti-concurrent causation provision, noting that "the vast majority of states that have considered the matter" have done so, and explaining that "purposefully seeking to avoid operation of [efficient and proximate cause analysis by including such a provision] … does not make the [policy] ambiguous."); *see also N&S Restaurant LLC v. Cumberland Mut. Fire Ins. Co.,* 20-CV-05289, 2020 WL 6501722, at *4 (D.N.J. Nov. 5, 2020) ("Similarly, the plain language of the Virus Exclusion here indicates that the Policy was drafted to eliminate the efficient proximate cause doctrine. The Policy does not

---

[6] The "efficient proximate cause" rule has been described by one Connecticut trial court as follows: "In the determination whether a loss is within an exception in a policy, where there is a concurrence of two causes, the efficient cause—the one that sets the other in motion—is the cause to which the loss is to be attributed, though the other cause may follow it and operate more immediately in producing the disaster. What is meant by proximate cause is not that which is last in time or place, not merely that which was in activity at the consummation of the injury, but that which is the procuring, efficient, and predominant cause." *Sansone v. Nationwide Mut. Fire Ins. Co.*, 770 A.2d 500, 503 (Conn. Sp. Ct. 1999).

provide coverage for losses caused directly or indirectly by a virus, regardless of any other cause or event that contributes concurrently or in any sequence to the loss. This language demonstrates the parties' intent to contract around the efficient proximate cause doctrine, language which courts have held is enforceable." (internal citation omitted)). A literal application of the virus exclusion, read as a whole, means that coverage is excluded if the virus is at least one causal factor in any loss. But even a narrower reading that demanded that the virus be a "significant", "substantial," or "near" indirect cause would be satisfied based on the allegations of the Amended Complaint and the language of the Order.

Plaintiff makes four arguments against application of the virus exclusion. First, it traces the origins of the virus exclusion to a 2006 endorsement created by the Insurance Services Office ("ISO"), which it attaches to its brief and which, according to Plaintiff, shows that the exclusion was meant to apply only when the virus has entered and contaminated a property. ECF No. 18 at 9. This document was not mentioned in, attached to, or relied on by the Amended Complaint. It is, therefore, not a document I may consider on a motion to dismiss under Rule 12(b)(6). *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 231 (2d Cir. 2016). In any event, the language of the virus exclusion – whatever its origins – includes no suggestion that it is limited to situations in which the virus has contaminated the insured's premises. The exclusion says simply that, "We will not pay for loss or damage caused directly or indirectly by … [a]ny virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease." ECF No.14-2 at 20, 23. There is no mention of contamination or any other restriction based on the virus's location. Other courts reading this language have reached the same conclusion. *See N&S Restaurant LLC*, 2020 WL 6501722, at *3 (rejecting plaintiff's argument that applicability of virus exclusion turned on whether virus had contaminated the property: "Although costs for

12

decontamination would certainly be a direct loss caused by the virus, this is not the only possible loss that would trigger the Virus Exclusion.").

Next, Plaintiff urges me to look beyond the words of the virus exclusion to the context in which they appear, arguing that that context shows that the virus exclusion was intended to be limited to situations of onsite contamination. The entire subsection containing the virus exclusion states as follows:

> We will not pay for loss or damage caused directly or indirectly by …
>
> j. Virus Or Bacteria
> (1) Any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease.
> (2) However, the exclusion in Paragraph 1 does not apply to loss or damage caused by or resulting from "fungi", wet rot, or dry rot. Such loss or damage is addressed in Exclusion i.
> (3) With respect to any loss or damage subject to the exclusion in paragraph 1, such exclusion supersedes any exclusion with respect to "pollutants."

ECF No. 14-2 at 20, 23. This context, Plaintiff argues, shows that the virus exclusion is limited to onsite contamination, because the other types of exclusions referred to in the same subsection – fungi, wet rot, dry rot, and pollutants – involve conditions that can only cause damage "via an infestation on the property." ECF No. 18 at 9. I do not find this persuasive. To begin with, I do not accept the premise that fungi, wet rot, dry rot, and pollution can only cause an insured loss if they occur at the insured premises. If those conditions existed in an adjacent building, for example, their corrosive effects could so damage that building that it fell onto the insured premises, thereby causing compensable damage. While fungi, dry rot, wet rot, and pollution are undoubtedly more likely to cause a loss when they occur on-premises, there is nothing intrinsically "onsite" about them. In addition, the notion invoked by Plaintiff that "words of a feather flock together", and should be interpreted similarly (ECF No. 18 at 9), is typically applied to words in a list contained within a single sentence, not words appearing in separate

13

sentences, set out in separate paragraphs, and separated by the word, "however" – as is the case with "virus, "fungi", "wet rot", and "dry rot" in the language quoted above. *See Dole v. United Steelworkers of America*, 494 U.S. 26, 36 (1990)("The traditional canon of construction, noscitur a sociis, dictates that words grouped in a list should be given related meaning." (internal quotation marks omitted)). In any event, "[t]hat a word may be known by the company it keeps is … not an invariable rule, for the word may have a character of its own not to be submerged by its association," and the principle "ha[s] no place … except in the domain of ambiguity." *Russell Motor Car Co. v. United States*, 261 U.S. 514, 519 (1923). Fungi and viruses are inherently different, take different forms, and behave differently in the environment. The term "fungi" is defined by the policy as "any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents, or by-products produced or released by fungi." ECF No. 14-2 at 35. Virus is not defined by the policy but its ordinary meaning is "[a]n infectious, often pathogenic agent or biological entity which is typically smaller than a bacterial, which is able to function only within the living cells of a host animal, plant, or microorganism…." Oxford English Dictionary https://www.oed.com/view/Entry/223861?redirectedFrom=virus#eid (last visited Dec. 15, 2020). A virus requires a host and cannot survive independently whereas a fungus or mold proliferates and produces by-products in its independent physical form. There is no justification for attributing the same "on the property" requirement to a virus that Plaintiff argues is required for a fungus. And the terms of the policy reinforce that the two were intended to be treated differently. The virus exclusion states it does "not apply to loss or damage caused by or resulting from 'fungi', wet rot or dry rot. Such loss or damage is addressed in Exclusion i." ECF No. 14-2 at 23. The policy clearly distinguishes between fungi and viruses, and I decline to

import into the virus exclusion an "onsite" or "contamination" restriction that appears nowhere in the terms of the policy.

Plaintiff's third argument relies on cases that, according to Plaintiff, stand for the proposition that "[l]osses caused by precautionary measures taken to avoid a peril are not caused by that peril." ECF No. 18 at 10. Under this theory, the virus could not have caused the losses because the Order was issued to prevent the virus from causing any losses. The cases that Plaintiff relies on, however, are distinguishable because the policies in those cases contained limiting language that did not allow for indirect or concurrent causes. For example, in *United Air Lines, Inc. v. Insurance Co. of PA*, 439 F.3d 128 (2d Cir. 2006), the relevant policy language stated that the business interruption coverage "is specifically extended to cover a situation when access to the Insured Locations is prohibited by order of civil authority as a *direct* result of damage to adjacent premises …." *Id.* at 131 (emphasis added). Applying this language, the court found that an airline's losses due to the closure of National Airport following the 9/11 terrorist attack on the Pentagon were not covered, because the closure order "was based on fears of future attacks" and was not a "direct result" of damage at the Pentagon, which the airline contended was "adjacent premises." *Id.* at 134-35. Similarly, in *Newman Myers Kreines Gross Harris P.C. v. Great Northern Ins. Co.*, 17 F. Supp.3d 323 (S.D.N.Y. 2014), the court interpreted a policy that did not include "direct or indirect" or anti-concurrent causation language, and found that a shutdown of the electric grid in anticipation of flooding from Hurricane Sandy meant that the policy's flood exclusion did not apply: "[T]he power outage Newman Myers complains of was not **directly** *caused by* flood, as that term is commonly understood." *Id.* at 333 (boldface added; italics in original). Plaintiff urges me to follow this reasoning here and to find that the Order was based on fear of further spread of the virus through in-person dining at Plaintiff's

15

restaurant.  But the exclusion in Plaintiff's policy is not limited to circumstances in which the

virus is a "direct" cause of loss; it also includes those in which it is an indirect cause, no matter

the sequence in which it combines with other factors to bring about the loss.  As shown, the

broad language of the virus exclusion easily encompasses the loss in this case.

Other courts that have considered the same "direct or indirect" virus exclusion have reached the

same conclusion. *See N&S Restaurant LLC*, 2020 WL 6501722, at *2-4 (collecting cases)

(Where policy excluded "loss or damage caused directly or indirectly by any Virus or Bacteria,"

"[t]here is no doubt that COVID-19, a virus, caused Governor Murphy to issue the Executive

Order mandating closure of Plaintiff's restaurant.  Therefore, COVID-19 is still a cause of the

closure because the Virus Exclusion *specifically provides for such indirect causation*.")

(emphasis in original).[7]

Finally, Plaintiff asserts that it has pled "that the sole cause of its loss was the [Order]

and, at this stage of the litigation, that allegation must be accepted as true, because causation of

loss is generally a question of fact."  ECF No. 18 at 11; *see also* ECF No. 13 (Amended

---

[7] To date, the parties have cited, either in their briefs or notices of supplemental authority, a total of thirty-five cases addressing the applicability of the virus exclusion to losses associated with the COVID-19 pandemic.  Of these, thirty-two cases have been decided in favor of the insurer.  The remaining three cases are either distinguishable or include little to no analysis.  *Elegant Massage, LLC v. State Farm Mutual Automobile Ins. Co.*, 2020 WL 7249624 *12-13 (E.D. Va. Dec. 9, 2020) found that the anti-concurrent causation language in the policy "has not been established as the law in this jurisdiction" and interpreted different exclusion language that did not include the "direct[] or indirect[]" causation language present in Plaintiff's policy and, further, required loss as a result of "growth, proliferation, spread or presence" of a virus; the court suggested that this language required "contamination at the Plaintiff's property."  In *Urogynecology Specialist of Fla. LLC v. Sentinel Ins. Co., Ltd.*, No. 6:20-cv-01174-ACC-EJK (M.D. Fla. Sept. 24, 2020) the court declined to make a decision on the merits when the "forms [were] not provided in the Policy itself, nor were they provided to the Court.  Without the corresponding forms which are modified by the exclusions, this Court will not make a decision on the merits of the plain language of the Policy to determine whether Plaintiff's losses were covered."  In *Taps & Bourbon on Terrace, LLC v. Underwriters at Lloyds London*, No. 00375, 2020 WL 6380449 (Pa. Ct. C.P. Oct. 26, 2020) the court summarily overruled preliminary objections and stated in a footnote that "[a]t this very early stage, it would be premature for this court [to] resolve the factual determinations put forth by defendant to dismiss plaintiff's claims.  Taking the factual allegations made the plaintiff's complaint as true, as this court must at this time, plaintiff has successfully pled to survive this stage of the proceedings."  I do not find these cases persuasive in light of the weight of authority favoring application of the virus exclusion when courts were presented with similar policy language and analyzed the issue.

Complaint alleging that "the sole cause of … Plaintiffs' … losses[] were the Closure Orders …."). But I need not accept the truth of conclusory allegations, *Ashcroft*, 556 U.S. at 678, and the characterization of the Order as the "sole cause" of Plaintiff's losses is a conclusory allegation. It is also one belied by the factual allegations of the Amended Complaint. ECF No. 13 at ¶¶ 3-4 (recognizing need to protect against human to human and surface to human spread of COVID-19, governmental entities entered civil authority orders suspending or severely curtailing business operations of non-essential businesses that interact with the public and provide gathering places for the individuals), ¶ 30 (noting that efforts to contain the virus "have led to civil authorities issuing orders closing many business establishments, including restaurants").

I therefore conclude that the virus exclusion applies and precludes coverage. I also conclude that it is not necessary to address Defendant's remaining arguments, because the virus exclusion bars coverage under each of the three provisions as to which Plaintiff seeks a declaratory judgment in favor of coverage. Plaintiff's claims for breach of contract also fail because Defendant has not breached any of these provisions by denying coverage on the basis of the virus exclusion.

## IV. CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss the Amended Complaint, ECF No. 14, is GRANTED.

IT IS SO ORDERED.

_____/s/_____

Michael P. Shea, U.S.D.J.

Dated:  Hartford, Connecticut

December 21, 2020